FILED
2026 Aug-24 PM 12:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| SERVISFIRST BANK, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. __________ |
| JPMORGAN CHASE BANK, N.A., | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff ServisFirst Bank ("ServisFirst") and Defendant JPMorgan Chase Bank, N.A. ("Chase") are currently engaged in litigation in *ServisFirst Bank v. JPMorgan Chase Bank, N.A.*, No. 23-cv-1507-AMM (N.D. Ala.). That case involves 133 checks issued by ServisFirst customers and deposited by fraudsters into Chase accounts prior to August 21, 2024. This case involves 21 fraudulent check transactions arising after August 21, 2024, as reflected in Exhibit A. With respect to those 21 checks, ServisFirst brings the following complaint against Chase:

**PARTIES, JURISDICTION, & VENUE**

1. ServisFirst is an Alabama state-chartered bank with its principal place of business located in Birmingham, Alabama. Therefore, pursuant to 28 U.S.C. § 1332(c)(1), ServisFirst is deemed to be a citizen of the State of Alabama.

2. Chase is a national banking association chartered by the United States Office of the Comptroller of the Currency with its main office located in Columbus, Ohio. Therefore, pursuant to 28 U.S.C. § 1332(c)(1) and 28 U.S.C. § 1348, Chase is deemed to be a citizen of the State of Ohio.

3. Chase maintains retail banking branches in the State of Alabama and accounts with retail and banking customers in the State of Alabama. Chase customers claiming an Alabama residence deposited several of the checks at issue in this case, and nearly all of ServisFirst's customers at issue in this case reside in Alabama. Chase targets Alabama customers and markets with advertising and account offerings. And Chase deposits innumerable checks drawn on accounts of Alabama banks and drawn by Alabama bank customers.

4. Pursuant to 28 U.S.C. § 1332(a)(1), this court has jurisdiction over the subject matter of the dispute because the parties are citizens of different states and because the amount in controversy exceeds $75,000.

5. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## BACKGROUND

6. This case arises out of Chase's conduct related to fraudulent accounts opened by its customers, fraudulent checks deposited into those accounts by its

customers, Chase's procedures, both as written and applied, in reviewing fraudulently deposited checks, and Chase's procedures, both as written and applied, in reviewing ServisFirst's claims with respect to those fraudulent checks.

7. Occurrences of check fraud have rapidly increased in the last decade, growing greater than fourfold in eight years, according to the U.S. Treasury's Financial Crimes Enforcement Network (FinCEN).[1] Check fraud nearly doubled from 2022 to 2023 alone and has continued to rise in the years since.[2] Bank, including Chase, are aware of check fraud trends and potential gaps in their fraud-prevention practices.

8. The federal government has recognized the check fraud crisis, as well, marshalling the efforts of several groups such as FinCEN, the U.S. Postal Service,

---

[1] *See* U.S. Treasury, *SAR Filings by Industry*, https://www.fincen.gov/reports/sar-stats/sar-filings-industry (last accessed Aug. 21, 2026) (downloadable spreadsheet for "Depository Institution"); *see also* American Bankers Association, *Deposit Account Fraud Survey*, https://www.aba.com/news-research/research-analysis/deposit-account-fraud-survey-report (Jan. 1, 2020) (finding that check fraud accounted for 47% of banking industry deposit account losses, for an industry wide total of $1.3 billion in losses).

[2] Kate Berry, *Surge in Counterfeit Checks Prompts Outcry from Small Community Banks*, American Banker, July 24, 2024, accessible at https://www.americanbanker.com/news/surge-in-counterfeit-checks-prompts-outcry-from-small-community-banks; Federal Reserve Financial services, *2026 Risk Officer Report*, https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2026-risk-officer-survey.pdf (last accessed Aug. 21, 2026); Federal Reserve Financial Services, *2024 Risk Officer Report*, https://www.frbservices.org/binaries/content/assets/crsocms/news/research/2024-risk-officer-survey-results.pdf (last accessed Aug. 21, 2026).

the Office of the Comptroller of the Currency, and the U.S. Senate Committee on Banking to combat check fraud.[3]

9. The rise in check fraud can be attributed to several factors, including the impersonal and cursory account-opening procedures used by large banks, the ability to deposit checks anonymously through ATM and mobile deposit, and the ease of exchanging fraudulent checks on illicit networks, including the dark web.[4] Indeed, Frank Abagnale, Jr., known for the check fraud scheme that inspired the movie *Catch Me If You Can*, stated that engaging in check fraud is "4,000 times easier to do today than when I did it, back some 50 years ago."[5]

10. Large banks, in particular, appear almost complicit in facilitating check fraud. For example, publications and industry leaders have noted larger banks'

---

[3] Michael Hsu, "Remarks for the Financial Literacy and Education Commission's Public Meeting" (July 10, 2024), accessible at https://www.occ.treas.gov/news-issuances/speeches/2024/pub-speech-2024-75.pdf; Testimony of Paul Benda on behalf of Am. Bankers Ass'n, before the U.S. Senate Comm. On Banking, Housing, & Urban Affairs (Feb. 1, 2024), accessible at https://www.banking.senate.gov/imo/media/doc/benda_testimony_2-1-241.pdf; FinCEN, *Alert on Nationwide Surge in Mail Theft-Related Check Fraud Schemes Targeting the U.S. Mail* (Feb. 27, 2023), accessible at https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Mail%20Theft-Related%20Check%20Fraud%20FINAL%20508.pdf.

[4] *E.g.*, Kate Berry, *'Like Wildfire': Rising check fraud pits small banks against big banks*, American Banker, Apr. 30, 2024, https://www.americanbanker.com/news/like-wildfire-rising-check-fraud-pits-small-banks-against-big-banks; Nina Trentmann, *Rise in Check Fraud Could Motivate Treasurers to Switch to Other Payment Tools*, The Wall Street Journal, Jan. 15, 2020, https://www.wsj.com/articles/rise-in-check-fraud-could-motivate-treasurers-to-switch-to-other-payment-tools-11579131505.

[5] *Banking with Interest*, *Catch Check Fraud If You Can: The Growing Issue for Banks, Consumers*, Intrafi, at 03:20 (Jun. 11, 2024), https://bankingwithinterest.libsyn.com/catch-check-fraud-if-you-can-the-growing-issue-for-banks-consumers.

widespread failure to adopt industry-standard security protocols in opening, monitoring, and restricting accounts and transactions by check thieves. These failures lead to fraud losses for regional and community banks, which have begun publicly asking, "Why are these accounts being opened and why are the big banks not following 'know your customer' procedures or complying with the law?"[6]

11. Banking industry leaders and regulators repeatedly single out Chase as a lead "offender" as to its failure to honor reasonable banking practices that would prevent check fraud and other fraudulent schemes.[7]

12. Even the fraud community views Chase as "bleeding"—i.e., reliably and predictably vulnerable to fraudulent schemes.[8]

13. In addition, community banks have noted larger banks' pattern and practice of delaying or denying check fraud claims by smaller banks: "Large banks

---

[6] Kate Berry, *'Like Wildfire'*, *supra*, note 4 (quoting CEO of Minnesota state bank trade association & citing similar authority); *see also* Community Bankers Ass'n of Illinois, *Letter to Regulators Regarding Check Fraud*, Mar. 28, 2024, accessible at https://www.cbaionline.com/gr/FraudReturnsAppealingToFederalRegulatorsForAssistance-comment-letter-march-2024.pdf; Kate Berry, *Surge in Counterfeit Checks*, *supra*, note 2.

[7] *See* Kate Berry, *'Like Wildfire'*, *supra*, note 4*; Letter to Regulators*, *supra*, note 5; *see also* U.S. Senate Permanent Subcommittee on Investigations, *A Fast and Easy Way to Lose Money: Insufficient Consumer Protection on the Zelle Network* (July 23, 2024), accessible at https://www.hsgac.senate.gov/wp-content/uploads/2024.7.23-PSI-Majority-Staff-Report-on-Zelle.pdf.

[8] *See ServisFirst Bank v. JPMorgan Chase Bank, N.A.*, No. 23-cv-1507-AMM (N.D. Ala.) (CM/ECF Document 141-2 (Dr. C.J. Howell Rep.) at 10); *see also* "Viral Videos of People Stealing Money from Chase ATMs Were Just Plain Check Fraud," CNN.com (Sept. 6, 2024), https://www.cnn.com/2024/09/03/business/chase-tiktok-trend.

that have teams of lawyers also are slow-walking the reimbursement process and treating check fraud as a cost of doing business, some bankers say."[9]

14. Consistent with that apparent complicity, Chase—before, while, and after it presented the checks at issue in this case—maintained patterns and practices in violation of industry-standard norms for preventing fraudulent and criminal activity, resulting in losses to ServisFirst, as further alleged below.

## I. <u>CHASE VIOLATED THE UCC PRESENTMENT WARRANTY.</u>

### *A. Altered Checks*

15. Exhibit A reflects that Chase has presented numerous checks to ServisFirst for payment that were altered as to the name of the payee or the amount.

16. These checks were electronically presented to ServisFirst in Alabama and were drawn on the accounts of individual and commercial customers of ServisFirst, most of whom are Alabama residents.

17. The relevant information for each altered check at issue—including amount, customer name, type of warranty breach, and dates of submitting a UCC warranty claim to Chase—is contained in Exhibit A.

---

[9] Kate Berry, *Rampant check fraud pits banks against other banks*, American Banker, Sept. 1, 2022, https://www.americanbanker.com/news/rampant-check-fraud-pits-banks-against-other-banks.

18. Pursuant to UCC § 4-208,[10] when Chase presents checks to ServisFirst, Chase warrants to ServisFirst that the check was not altered.

19. Chase breached these warranties to ServisFirst because the presented checks, in fact, contained alterations.

20. Upon presentment in Alabama, ServisFirst paid Chase for each of the checks at issue, debiting its customers' accounts by the amounts on the checks as presented. The amount paid is reflected in Exhibit A.

21. Within days or weeks of receiving notice of the alteration from its customer, the drawer, ServisFirst corresponded with Chase, providing evidence that each check was altered and requesting reimbursement. The date of such correspondence is reflected in Exhibit A.

22. Chase refused to remit payment for the amount of the altered checks, claiming that the checks were "counterfeit" and thus not its responsibility.

23. ServisFirst sent additional letters and emails to Chase, seeking to avoid litigation and resolve the disputed check amounts. ServisFirst's appeals were unsuccessful.

---

[10] The UCC's choice of law provision governing fraudulent check disputes provides: "The liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located." Ohio Rev. Code § 1304.02(B); Ala. Code § 7-4-102(b). JPMorgan's articles of association state that its main office is in Columbus, Ohio, so Ohio law governs this dispute. At any rate, virtually every state has adopted identical UCC provisions for presentment warranties. *Compare* Ohio Rev. Code § 1304.18 *with* Ala. Code § 7-4-208; N.Y. UCC § 4-207; 6 Del C. § 4-208.

24. Reg CC imposes a rebuttable presumption that fraudulent items that are electronically presented are altered, rather than derived from original checks containing forged drawer signatures. *See* 12 C.F.R. § 229.38(i). Some of Chase's denial letters asserted that the drawer signatures were forged, but Chase failed to provide evidence of that forgery that would be sufficient to rebut Reg CC's presumption of alteration. In addition, on information and belief, Chase's deposit reviewers are not trained and do not have the ability to identify forged signatures.

25. On information and belief, Chase maintains policies and procedures that fail to comply with the UCC, Reg CC, and industry norms concerning alterations and check fraud in at least four ways:

a. *First*, on information and belief, Chase's check fraud policies define "counterfeit" checks so broadly that it justifies denying reimbursement on almost any grounds. Chase also maintains policies with vague, ambiguous, and contradictory definitions of "alterations." The result is that Chase maintains policies, practices, and patterns of avoiding UCC liability by labeling checks as "counterfeit" that should be considered altered or forged endorsements.[11]

[11] ServisFirst disputes the applicability of the term "counterfeit" under the governing UCC law. *See infra*, Section I.C.

b. *Second*, on information and belief, Chase maintains different standards for assessing potential fraud depending on whether the check was suspected to be altered (Chase's responsibility) or "counterfeit" (supposedly ServisFirst's responsibility). Chase's reviewers are permitted to conclude that a check is altered based solely on a visual inspection of an electronic image, which then allows the reviewer to restrict the funds in the account and protect Chase. On the other hand, reviewers may conclude that a check is "counterfeit"—and restrict funds in the account—only if additional, heightened review steps are taken, including contacting the maker of the check. On information and belief, Chase's reviewers frequently do not take those additional steps—either because they are restricted from doing so or because their location, in India or the Philippines, prevents them from doing so. As a result, Chase often leaves funds unrestricted that are derived from checks that it knows may be counterfeit, meaning that those funds are not available to reimburse payor banks like ServisFirst.

c. *Third*, on information and belief, Chase denies UCC claims from payor banks like ServisFirst without conducting an adequate investigation. Chase then provides false and/or misleading reasons to payor banks for denying those claims.

d. *Fourth*, on information and belief, Chase occasionally suspends funds related to fraudulent checks and maintains such funds in an earmarked account that is distinguishable from other funds. While Chase knows that it has no right to possess those funds, Chase refuses to release those funds to payor banks like ServisFirst or their customers.

26. Chase has repeatedly forced ServisFirst to resort to yearslong litigation concerning altered checks, rather than engaging in good faith negotiation to resolve such claims or reconsider its position.

27. Chase's refusal to honor its presentment warranties in compliance with industry standards, even after the prior litigation, reflects a trend among larger banks in "bullying smaller banks into accepting the losses."[12]

28. As such, Chase's ongoing and flagrant refusal to reimburse ServisFirst for the altered checks at issue constitutes bad faith and malicious conduct.

### *B. Checks with Forged or Missing Payee Endorsements*

29. Exhibit A reflects that Chase presented numerous checks to ServisFirst for payment that had either forged or missing payee endorsements.

30. These checks were presented to ServisFirst in Alabama and were drawn on the accounts of individual and commercial customers of ServisFirst, most of whom are Alabama residents.

---

[12] *See* Berry, *Rampant Check Fraud*, *supra*, note 7.

31. The relevant information for each check with a forged or missing payee endorsement—including, amount, customer name, and nature of the forgery—is contained in Exhibit A.

32. Pursuant to UCC § 4-208, Chase warrants that it is entitled to enforce any check that it presents to ServisFirst.

33. Chase breached that warranty to ServisFirst because Chase was not entitled to enforce the checks at issue by virtue of the fraudulent or missing payee endorsements.

34. Upon presentment, ServisFirst paid Chase for each of the checks at issue, debiting their customers' accounts by the amounts on the checks as presented. The amount paid is reflected in Exhibit A.

35. Within days or weeks of receiving notice of the fraudulent or missing payee endorsements from its customers, ServisFirst corresponded with Chase as to each check, requesting reimbursement. The date of such correspondence is reflected in Exhibit A.

36. Chase refused to remit payment for the amount of the checks with fraudulent or missing payee endorsements.

37. ServisFirst sent additional letters and emails to Chase, seeking to avoid litigation and resolve the disputed check amounts.

38. On information and belief, Chase maintains policies and procedures that fail to comply with the UCC, Reg CC, and industry norms, as alleged above. *See supra*, Paragraphs 26–29.

39. Despite the prior litigation and discussions described above, Chase failed to reimburse the checks at issue.

40. Chase's refusal to honor its presentment warranties in compliance with industry standards, even after the prior litigation, reflects a trend among larger banks in "bullying smaller banks into accepting the losses."

41. As such, Chase's ongoing and flagrant refusal to reimburse ServisFirst for the checks at issue constitutes bad faith and malicious conduct.

***C. Checks Mischaracterized As "Counterfeit"***

42. Chase incorrectly denied reimbursement for nearly every check at issue because the check was allegedly "counterfeit."

43. The UCC does not allocate liability for "counterfeit" items. Instead, the presentment warranty allocates liability to depositary banks (here, Chase) for (1) altered checks, (2) checks with a forged or missing endorsement, and (3) checks accepted by the depositary with "knowledge that the signature of the purported drawer of the draft is unauthorized." UCC § 4-208(a)(3). Courts have found that changes to the payee name constitute the "classic" alteration. *Wachovia Bank, N.A. v. Foster Bancshares, Inc.*, 457 F.3d 619, 622 (7th Cir. 2006).

44. On the other hand, the UCC allocates liability to drawee banks (here, ServisFirst) for checks with "unauthorized drawer signatures." *See* UCC § 3-418(a).

45. Each of the checks at issue here began as a legitimate transaction. The payor issued a legitimate instrument in the form of a paper check that included an authorized drawer signature.

46. On information and belief, each of the checks at issue here was intercepted by a fraudster. A fraudster then digitally scanned the check and manipulated the digital image to change, among other things, the payee name, amount, or payee endorsement on the validly issued instrument, while preserving among other things, the check number, the date, and the drawer signature.[13] The fraudster then deposited the changed instrument—sometimes referred to as a "cooked" check—into a Chase account.

47. These "cooked" checks fall under the UCC definition of altered checks because they contain an authorized drawer signature and were digitally altered as to the amount, payee, or endorsement. *See* UCC § 3-407 (Alteration means "an unauthorized change in an instrument that purports to modify in any respect the

[13] *See Banking With Interest, Catch Check Fraud If You Can: The Growing Issue for Banks, Consumers*, IntraFi, at 03:20 (Jun. 11, 2024), https://bankingwithinterest.libsyn.com/catch-check-fraud-if-you-can-the-growing-issue-for-banks-consumers (interview with Frank Abagnale, Jr., describing the process for modern check cooking); *What Is Check Fraud?*, https://www.experian.com/blogs/ask-experian/what-is-check-fraud/ (July 10, 2023); "Check Baking: More Dangerous Than Check Washing?," https://orbograph.com/check-baking-more-dangerous-than-check-washing/ (last accessed July 31, 2024).

obligation of a party"). The rebuttable presumption of alteration under Reg CC also applies to such checks. *See* 12 C.F.R. § 229.38(i).

48. In addition, "cooked" checks that alter only the name of the payee, yet contain the same check number, same check amount, and same drawer signature, cannot be easily detected by the drawer and should not be treated by the same rules as "counterfeit" checks. *See* Comment 3 to UCC § 3-404 ("[T]he drawee bank, at least in some cases, may be able to detect the forgery by comparing the signature on the check with the specimen signature that the drawee has on file. But in some forged check cases the depositary bank is in a position to detect the fraud."). Indeed, surveys of banking leaders suggest that liability for such checks should fall on the depositary bank.[14]

49. On information and belief, Chase does not maintain that "cooked" checks, including the checks at issue, contained unauthorized drawer signatures, nor could it because its reviewers are not trained to review such signatures. Instead, Chase refused to reimburse ServisFirst for the checks at issue because they are "counterfeit."

[14] "Survey: Check fraud liability should be at bank of first deposit," BankBeat, July 29, 2024, https://bankbeat.biz/survey-check-fraud-liability-should-be-at-bank-of-first-deposit/.

50. Chase bears liability for cooked checks because they are altered items, presented in violation of the warranty under UCC § 4-208(a)(2) (Ohio Rev. Code § 1304.18(A)(2)).

51. In addition, on information and belief, Chase policies and procedures contain convoluted and contradictory terms that fail to comply with the UCC and industry norms concerning check fraud, as alleged above. The terms of those policies are vague, ambiguous, and so overinclusive that Chase's employees are misinformed as to the governing UCC law, and Chase can label nearly any check as counterfeit to avoid liability.

### *D. Chase's Knowledge and Notice of Unauthorized Drawer Signatures*

52. As stated above, ServisFirst maintains that every check at issue contains an authorized drawer signature.

53. Even so, and only in the alternative, if it is found that the checks contain unauthorized drawer signatures, Chase had actual knowledge that the checks contained unauthorized drawer signatures.

54. On information and belief, Chase purports to assess the legitimacy of the transaction and drawer signature at the time of deposit and within hours after deposit, before presentment occurs.

55. For example, on information and belief, Chase maintains fraud prevention software and deposit review mechanisms that immediately flag check

deposits as high risk or suspected fraud at the moment of deposit and within hours thereafter.

56. Alternatively, Chase had notice of the unauthorized drawer signatures because the checks so obviously contained forgeries that commercially reasonable review of the check as presented would indicate that the check and signature were forged. *See* Comment 4 to UCC § 3-405; Ohio Rev. Code § 1304.03(E).

57. For example, some of the checks at issue contained payment amounts and markings obviously unusual and unlike other checks deposited at Chase. Others lacked security features that were expressly identified on the face of the check. Others were deposited into accounts that had little or no prior deposits, for amounts that would trigger extra scrutiny under industrywide deposit standards. And others were made to obviously fictitious payees or payees not intended to have any interest in the check.

58. A reasonable bank would have known of the fraudulent nature of these checks and depositors if it adhered to industry-wide standards for check fraud prevention, as explained below. *See infra*, Section II.

59. Based on these facts, Chase either had actual or constructive notice of the unauthorized checks at issue. And Chase's exercise of ordinary care in paying or taking the check would have revealed the unauthorized nature of these checks.

60. Thus, Chase's presentment of the checks violated the warranty that it had no knowledge of the unauthorized signatures. *See* UCC § 4-208(a)(3) (Ohio Rev. Code § 1304.18(A)(3)). And it bears liability for any losses attributable to its failure to exercise ordinary care. *See* UCC § 3-404(d).

### *E. Chase's Arbitrary Refusal to Reimburse ServisFirst*

61. Consistent with national trends showing that large banks routinely deny check fraud reimbursement to smaller banks,[15] Chase has refused to reimburse ServisFirst for several fraudulent checks that it presented to ServisFirst. The difficulties ServisFirst faced in communicating with Chase about the checks at issue evidence Chase's utter disregard for its reimbursement responsibility.

62. For example, ServisFirst attempted to communicate with Chase about the checks at issue, including with employees at Chase's "without entry" department and with counsel for Chase.

63. Chase displayed no willingness to resolve its reimbursement obligations short of litigation.

64. In response, ServisFirst has been forced to file suit against Chase, as noted above.

65. Chase's refusal to reconsider or make decisions about certain checks stands in contradiction to its own policies and procedures, which require timely

[15] *See supra*, notes 2, 3, 5, & 7.

review of claims and reconsideration of denials upon inquiry by the check drawer's bank.

66. Meanwhile, ServisFirst continued to accrue losses for fraudulent checks that Bank continued to present in breach of the presentment warranties.

## II. CHASE VIOLATED INDUSTRY NORMS TO MONITOR AND PREVENT FRAUD.

67. Before, while, and after Chase presented the checks described above, Chase failed to comply with industry-standard practices and norms aimed at preventing fraudulent and criminal activity, resulting in losses to ServisFirst.

### *A. Industry Standards for Fraud Prevention*

68. The banking industry preserves the integrity of the American financial system by adopting practices to prevent fraud, money laundering, and criminal financial schemes.

69. Various statutes and regulations reflect these industry norms by requiring financial institutions to maintain adequate "know your customer" (KYC) and anti-money laundering (AML) procedures. These laws reflect reasonable industry expectations that banks like Chase collect information about each customer and understand the typical banking behavior for their accounts. Together, these norms and laws aim to "prevent the laundering of money" and "facilitate the tracking of money that has been sourced through criminal activity." *E.g.*, 31 U.S.C. § 5311.[16]

[16] ServisFirst does not assert causes of action arising from the statutes and regulations cited.

70. For example, industry norms require Chase to develop, administer and maintain a program to (1) gather information sufficient to develop a "risk profile" for each customer; (2) conduct ongoing monitoring to identify and report suspicious transactions; (3) provide a system of internal controls to ensure compliance at all times, (4) provide for independent testing of the bank's ongoing compliance, (5) designate an individual to coordinate and monitor compliance, and (6) provide training for appropriate personnel to ensure they comply with these and other fraud-prevention obligations. *See, e.g.*, 12 C.F.R. § 21.21; 31 C.F.R. § 1020.210.

71. Likewise, industry norms require Chase to verify the identity of its customers and the nature of the customer's account, including obtaining and maintaining documentation of each customer's name, address, taxpayer identification information, and conduct ongoing due diligence as to suspicious account activity. *See, e.g.*, 31 U.S.C. § 5318(l); 31 C.F.R. §§ 1020.210 & 1020.220.

72. Various sources have reported red flags that any reasonable bank would recognize as indicating possible money laundering, fraud, or other misconduct mandating further inquiry.[17] The following is a list of these red flags that were

[17] *See* Testimony of Paul Benda on behalf of Am. Bankers Ass'n, before the U.S. Senate Comm. On Banking, Housing, & Urban Affairs (Feb. 1, 2024), accessible at https://www.banking.senate.gov/imo/media/doc/benda_testimony_2-1-241.pdf; FinCEN, "Alert on Nationwide Surge in Mail Theft-Related Check Fraud Schemes Targeting the U.S. Mail," Feb. 27, 2023, accessible at https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Mail%20Theft-Related%20Check%20Fraud%20FINAL%20508.pdf; Federal Financial Institutions Examination

present as to the checks and accounts at issue in this case and that a reasonable bank would have uncovered and recognized:

a. Non-characteristic large withdrawals on a customer's account;

b. Sudden check deposits and withdrawal or transfer of funds by existing customers with little history of check deposits;

c. Non-characteristic, sudden, abnormal deposit of checks, often electronically, followed by rapid withdrawal or transfer of funds;

d. New customer opens an account that is seemingly used only for the deposit of checks followed by frequent withdrawals and transfer of funds;

e. Checks used to deposit or withdraw funds from a customer's account appear to be of a noticeably different check stock than check stock used for known, legitimate transactions; and

f. Examination of suspect checks reveals faded or differing handwriting and fonts on the same check, suggesting check "washing," cooking, or overwriting.

73. Reasonable banks routinely adopt industry-standard practices to prevent fraud and recognize red flags, including maintaining systems of controls to identify broad patterns and risks in account activity, and monitoring suspicious transactions and the relationships between transacting parties. Industry norms also dictate that Chase use external sources of information like the internet, commercial database searches, and direct inquiries to ascertain the identity of transacting parties or the nature of suspicious account transactions.

---

Council (FFEIC), *BSA/AML Manual*, Appendix F: Money Laundering and Terrorist Financing "Red Flags," Feb. 27, 2015, accessible at https://bsaaml.ffiec.gov/manual/Appendices/07.

74. In addition, industry norms dictate that reasonable banks adopt fraud detection software platforms to continuously monitor customer account activity.

75. Industry norms dictate that such software assess applications for new accounts and young accounts for red flags of potential fraud or illicit account opening.

76. Industry norms dictate that such software automatically assess withdrawals and deposits for red flags by reviewing transactions against customers' backgrounds and transaction histories, to detect and analyze risky or fraudulent behavior.

77. Such software provides knowledge to a bank about risky deposits, suspicious account activity, and other fraud red flags at the moment such transactions occur.

78. Further, reasonable banks adhering to industry norms train their employees to monitor and understand customer account activities—including tellers, account maintenance, check review, and check fraud personnel—enabling them to detect money laundering and fraud. In addition, supervising personnel, specially designated by each bank's compliance officer, must oversee the day-to-day implementation of the bank's risk management framework.

79. Together, these laws and industry norms ensure that banks uphold their duty to other banks and the public at-large by knowing their customers and

preventing money laundering, fraud, and other criminal activity. Other banks and the public rely on banks—especially large banks such as Chase—to uphold their duty to honor these laws and practices for maintaining the trustworthy and fair transfer of funds.

80. If Chase reasonably observed these industry standards related to fraud prevention, Chase should have maintained an understanding of the financial activity of its customers. Thus, Chase should have been able to identify unusual and suspicious transactions based on the type and frequency of transactions in which its customers are likely to engage.

81. Given these industry norms and obligations related to fraud prevention, Chase either knew or should have known that its customers opened the accounts at issue with the intent to deposit funds obtained from illegal check fraud, that its customer were maintaining accounts and depositing checks obtained from illegal check fraud, and that its customers were withdrawing funds obtained from illegal check fraud.

### *B. Chase Fails to Comply with Industry Standards*

82. Before, while, and after Chase presented the checks described above, Chase failed to comply with industry standards related to fraud prevention. These failures resulted in Chase knowingly permitting fraudulent actors to deposit fraudulent checks at Chase, launder the funds of check fraud through accounts at

Chase, and withdraw or transfer fraudulent funds from Chase. Chase's conduct proximately harms smaller banks, including ServisFirst.

83. Chase's unreasonable conduct begins with its policies for account opening, fraud prevention, check acceptance, check and account review, check fraud claims handling, and other check fraud matters. As explained above, those policies are convoluted, contradictory, ambiguous, and vague, such that Chase can purportedly deny liability for check fraud on nearly any grounds. *See supra*, § I.

84. Industry leaders have pointed out routine failures by large banks—including Chase, specifically—to adhere to industry norms related to know-your-customer, anti-money laundering, and check fraud practices.[18]

85. Even so, Chase egregiously failed to adhere to industry norms in at least three categories of circumstances.

86. *First*, on information and belief, some of the Chase customer accounts at issue were opened by individuals with insufficient account documentation to verify the customers identity and intended banking practices, such that a reasonable

[18] Kate Berry, *Surge in Counterfeit Checks*, *supra* ("[P]eople are able to open bank accounts online at these larger institutions and the customer identification procedures are not being done right.") (quoting officer of First National Bank of Ottawa); *see also* Community Bankers Ass'n of Illinois, *Letter to Regulators*, *supra* ("Fraudulent Returns are actually a symptom of this problem, not its source. The source is the apparent Know Your Customer lapses at the Largest Institutions that allow fraudulent accounts, into which fraudulent checks are deposited, to be opened in the first place.") (identifying Chase as a top three "offender" and "worst culprit" in both 2023 and 2024).

bank either should have refused to open a customer account or would have imposed intense ongoing scrutiny.

87. On information and belief, Chase either opened such customer accounts without obtaining information sufficient to alert it to potential fraud, or Chase obtained such information and ignored it as to the checks and accounts at issue. Even minimal compliance with industry norms for account-opening would have alerted Chase that the customers' accounts were opened under suspicious circumstances, for the purpose of committing bank fraud or money laundering.

88. That conduct permitted fraudulent check funds to be deposited and withdrawn under circumstances that a reasonable bank would have prevented.

89. *Second*, a reasonable bank in Chase's position would have ascertained the obvious, fraudulent activity at issue due to various red flags, on information and belief:

a. The checks at issue amounted to greater than ten times the depositor's average year-to-date balance, such that the deposit at issue did not make sense for the account;

b. The depositor often attempted to withdraw the fraud funds in a single, large transaction or a rapid series of smaller transactions;

c. Accounts were often very new (less than 6 months old), and they reflected no or minimal deposit activity until the fraudulent item was deposited; and

d. The checks at issue were written by corporate entities, with "memo" lines inconsistent with the purported purposes of the personal accounts at issue. In addition, the entities often resided in different states or cities from the purported individual payees.

90. A reasonable bank adhering to industry-standard practices related to fraud prevention monitoring would have been alerted to the suspicious nature of these transactions.

91. On information and belief, Chase either failed to engage in such monitoring and red-flagging or ignored such practices as to the checks at issue. Even minimal compliance with industry norms for account-monitoring and related employee conduct would have alerted Chase that the customers' accounts were being operated under suspicious circumstances for the purpose of committing bank fraud or money laundering.

92. For example, on information and belief, Chase maintains procedures memorializing certain high-risk indicators, including accounts with consistent negative balances, those with out-of-pattern transaction activity, those in which the check maker and depositor are located in different states, and those in which the deposit doesn't make sense for the account. These circumstances applied to many of the checks and accounts at issue.

93. On information and belief, Chase either failed to follow its own policies concerning monitoring for "high risk indicators" or engaged in such monitoring but willfully ignored the information unearthed.

94. On information and belief, Chase's policies require its employees to engage in ongoing review and categorization of "customer profiles." Those policies

define "strong" customer profiles as those with sufficient activity to support the deposits at issue, whereas "not strong" profiles would not support the deposit.

95. On information and belief, the Chase customer profiles were not strong and did not justify the deposits and withdrawals at issue.

96. On information and belief, Chase either failed to follow its own policies concerning monitoring "customer profiles," or it engaged in such monitoring but willfully ignored the information unearthed.

97. Documents produced by Chase also reflect that it adopted fraud prevention and red-flag software purporting to assess account opening and account activity for potential fraud.

98. On information and belief, such technology assesses multiple data points to monitor for potential fraud, and provides a summary of that information to Chase in an ongoing way and at the moment of any transaction.

99. On information and belief, Chase either inadequately operated or ignored that software, such that egregious levels of fraud were permitted to occur.

100. Thus, Chase failed to observe reasonable, industry standards as to account-opening, KYC, AML, and fraud prevention. That failure permitted fraudulent check funds to be deposited and withdrawn under circumstances that a reasonable bank would have prevented.

101. *Third*, on information and belief, Chase permitted funds derived from fraudulent checks to be withdrawn, despite knowing the fraudulent source of those funds.

102. On information and belief, Chase's fraud prevention technology alerted and red flagged the deposits at issue as high risk or potential fraud.

103. On information and belief, those alerts led Chase employees to engage in a limited review of the fraudulent transactions.

104. On information and belief that review led Chase to conclude that the checks at issue were suspected or confirmed as fraud.

105. On information and belief, when this red-flagging and review occurred, it often occurred within hours or days of the check being deposited—in other words, before the funds had been withdrawn, and while the funds remained in Chase's control.

106. Industry norms require that reviewers try to resolve whether a check is fraudulent or not, up to and including by contacting the maker of the check, if possible, based on contact information readily accessible (including the phone number on legitimate comparator checks) to verify the legitimacy of the transaction, before permitting a hold on the funds to expire and the funds to be withdrawn.

107. Chase did not contact the check makers to verify the legitimacy of the checks at issue, even though it suspected the checks to be fraudulent after review.

108. Industry norms further require that reviewers try to resolve whether a check is fraudulent or not, up to and including by contacting the payor bank to verify the legitimacy of the transaction before permitting a hold on the funds to expire and the funds to be withdrawn.

109. Chase did not contact ServisFirst to verify the legitimacy of the checks at issue, even though it suspected the checks to be fraudulent after review.

110. Industry norms require that, upon finding a transaction to be high-risk, suspected fraud based on human review, Chase should restrain all funds derived from the transaction and/or restrict the account at issue, until determining whether the check is fraudulent.

111. On information and belief, Chase found the transactions at issue to constitute high risk, suspected fraud based on human review, but at most imposed a 7-day hold on the check transactions at issue and did not restrict the funds or account further.

112. Industry norms do not allow banks to treat the analysis and account restrictions related to suspected fraud differently, depending on whether it the suspected fraud is a "counterfeit" versus an "alteration."

113. On information and belief, Chase maintains disparate procedures for analyzing and restraining funds, depending on whether it deems the check fraud to be a "counterfeit" versus alteration, as explained in Paragraphs {27 & 28} above.

114. Chase's inadequate fraud-prevention efforts reflect and result from Chase's convoluted and contradictory check-fraud policies. For example, Chase's check-fraud policies define alterations, counterfeits, and forged endorsements in varying and contradictory terms, as described above. *See supra*, § I.

115. On information and belief, Chase maintains separate, siloed-off personnel teams—governed by separate check-fraud policies and procedures—handling acceptance of checks for deposit, review of red-flagged items, review of check fraud claims by other banks, and approval for issuing check fraud reimbursements. These practices do not reflect reasonable, industry-wide approaches to address KYC, AML, and fraud prevention.

116. Despite these unreasonable practices, on information and belief, Chase succeeded in placing a temporary 7-day hold on the funds related to the red-flagged checks at issue in this case.

117. Fraudulent actors then sought to withdraw the funds at issue from those restricted accounts.

118. Astonishingly, Chase often lifted the restriction and permitted the fraudulent actor to withdraw the funds at issue—*even after Chase employees concluded that the check resulted from suspicious or illegal activity*.

119. Such conduct reflects that Chase's fraud prevention policies and employee oversight either (1) did not exist, (2) existed in such minimal form that

they failed to meet all industry norms, or (3) existed only nominally and were routinely and willfully disregarded.

120. Either way, Chase participated in the check-fraud schemes by its failure to follow industry norms and by knowingly permitting the withdrawal of funds from suspicious or illegal activity.

121. Because the checks bore ServisFirst's routing information, Chase knew that ServisFirst was the payor bank for the checks at issue.

122. ServisFirst paid the checks at issue in reliance on the fact that Chase would follow the industry standards for fraud prevention alleged above.

123. Because Chase routinely presents checks for payment to ServisFirst, including the checks at issue, and because Chase plays a central role in the checking system, Chase knew that ServisFirst would pay the checks at issue in reliance on Chase's fraud-prevention conduct.

124. Chase knew that ServisFirst would suffer losses by paying the checks at issue if it failed to follow the industry standards for fraud prevention alleged above.

125. If Chase's account managers had adhered to industry norms, they would have uncovered and recognized the indicia of fraud surrounding opening of the fraudulent accounts and fraudulent deposit of the checks at issue.

126. If Chase's deposit operations team had adhered to industry norms, it

would have uncovered and recognized the indicia of fraud surrounding the deposit accounts and checks at issue.

127. Chase's supervisory staff knew the industry norms and obligations alleged above. That staff and Chase knew that the employees were not following those norms and, in some cases, not even following Chase's procedures.

128. As such, Chase's employees were incompetent and such incompetence was known to Chase.

129. If Chase's supervisors had adhered to those norms, they would have discovered the indicia of fraud surrounding the depositors and checks at issue, they would have sufficiently trained employees to recognize such indicia, and they would have corrected employees failing to do so.

130. On information and belief, Chase's supervisory staff knew that its employees were failing to honor industry norms related to check fraud, including the failures alleged in Paragraphs {96–100}, and they failed to take steps to train and correct employees or remedy the situation.

131. On information and belief, Chase maintains a department devoted to remaining aware of emerging fraud trends and threats Chase may face.

132. Nevertheless, Chase appears unaware that the fraud community publicly discusses Chase as particularly vulnerable to fraudulent account opening and check fraud, in ways that are predictable and exploitable.[19]

133. On information and belief, Chase took no steps to correct the failures and weaknesses publicly discussed by fraudsters.

134. Thus, Chase failed to observe reasonable industry standards as to account review, KYC, AML, and fraud prevention. That failure permitted fraudulent check funds to be deposited and withdrawn under circumstances that a reasonable bank would have prevented.

135. Community banks have singled out Chase as a repeated and egregious "offender" by failing to follow industry norms in knowing its customers, opening accounts, and preventing fraud, money laundering, and other criminal activity.[20]

## COUNT I
## BREACH OF PRESENTMENT WARRANTY AS TO ALTERED CHECKS
## (UCC § 4-208; 12 C.F.R. § 229.38(i))

136. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–66 as if fully set forth here.

[19] *E.g.*, "Viral Videos of People Stealing Money from Chase ATMs Were Just Plain Check Fraud," CNN.com (Sept. 6, 2024), https://www.cnn.com/2024/09/03/business/chase-tiktok-trend; *ServisFirst Bank v. JPMorgan Chase Bank, N.A.*, No. 23-cv-1507-AMM (N.D. Ala.) (CM/ECF Document 141-2 (Dr. C.J. Howell Rep.) at 10).

[20] *See supra* note 15.

137. The checks at issue were derived from legitimate payment orders and contained authorized drawer signatures.

138. Chase breached the presentment warranty owed to ServisFirst under the UCC § 4-208 because the checks at issue contained alterations.

139. ServisFirst requested reimbursement of the amount at issue for the altered checks.

140. Chase refused those requests.

35. For all electronically presented checks that were allegedly altered, a presumption applies that such checks were altered, rather than derived from a check with an unauthorized drawer signature. *See* 12 C.F.R. § 229.38(i). Chase's evidence supporting its reimbursement denials fails to rebut this presumption.

36. Altered checks include those checks Chase mischaracterized as "counterfeit," and on that basis, denied reimbursement to ServisFirst.

141. As a direct and proximate result of Chase's breach of the presentment warranties as to the altered checks, ServisFirst has suffered damages in amounts reflected in Exhibit A, plus interest, costs, and attorneys' fees.

**COUNT II**
**BREACH OF PRESENTMENT WARRANTY AS TO CHECKS WITH FRAUDULENT OR MISSING PAYEE ENDORSEMENTS**
**(UCC § 4-208)**

142. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–66 as if fully set forth here.

143. The checks at issue were derived from legitimate payment orders and contained authorized drawer signatures.

144. Chase breached the presentment warranty owed to ServisFirst under UCC § 4-208 because Chase was not entitled to enforce the checks with fraudulent or missing payee endorsements.

145. ServisFirst requested reimbursement of the amount at issue concerning the checks with forged or missing endorsements.

146. Chase refused those requests.

147. As a direct and proximate result of Chase's breach of the presentment warranties as to the checks with fraudulent or missing payee endorsements, ServisFirst has suffered damages in the total amount damages in amounts reflected in Exhibit A, plus interest, costs, and attorneys' fees.

## COUNT III
## BREACH OF PRESENTMENT WARRANTY AS TO CHECKS WITH KNOWN, UNAUTHORIZED DRAWER SIGNATURES
## (UCC § 4-208)

148. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–66 as if fully set forth here.

149. As stated above, ServisFirst maintains that every check at issue contains an authorized drawer signature.

150. Even so, and only in the alternative, if it is found that the checks contain unauthorized drawer signatures, Chase had actual knowledge that such signatures

were unauthorized because its fraud technology and deposit review processes informed it that the checks were high-risk and unauthorized.

151. Alternatively, Chase had inferential knowledge or notice of the unauthorized drawer signatures because the checks were so obviously forged that commercially reasonable review of the check as presented would indicate that the check and signature were forged.

152. On information and belief, Chase had actual knowledge or constructive notice of the unauthorized signatures in these checks.

153. Thus, Chase bears liability for the checks with known, unauthorized drawer signatures under UCC § 4-208(a)(3).

154. Further, Chase bears liability for fraudulent checks for which Chase failed to exercise ordinary care in receiving and presenting the checks. *See* UCC § 4-202(a); UCC § 3-404.

155. As a direct and proximate result of Chase's breach of the presentment warranties as to the checks with fraudulent or missing payee endorsements, ServisFirst has suffered damages in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

**COUNT IV**
**COMMON LAW NEGLIGENCE**

156. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–139 as if fully set forth here.

157. Chase owed a duty to ServisFirst to observe industry standards related to know-your-customer, anti-money laundering, and fraud prevention.

158. Chase failed to act as a reasonable bank would by failing to observe industry standards related to know-your-customer, anti-money laundering, fraud prevention, check acceptance, check and account review, check fraud claims handling, and other check fraud matters.

159. Chase failed to act as a reasonable bank in maintaining and implementing policies governing know-your-customer, anti-money laundering, fraud prevention, check acceptance, check and account review, check fraud claims handling, and other check fraud matters.

160. In some cases, Chase investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Thus, Chase knew that the funds at issue resulted from fraud and that neither it nor its customers were entitled to the funds at issue because the funds resulted from fraud.

161. In some cases, Chase failed to contact either the maker of the check or the drawee bank to verify the legitimacy of the deposit.

162. In some cases, Chase failed to conduct adequate deposit review that would inform it of the obvious indicia of fraud that a reasonable bank would observe.

163. In some cases, Chase adhered to a procedure of selectively investigating and restricting funds related to purportedly altered transactions, while employing a

lower standard of investigation and restriction related to purportedly counterfeit transactions, on the self-serving view that losses related to the latter would fall on payor banks.

164. In some cases, Chase failed to implement or receive information from its fraud technology that alerted the transaction as high risk and fraudulent.

165. In some cases, Chase placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. In those cases, Chase learned of the fraudulent checks and accounts but nevertheless received double payment as to the funds for fraudulent checks by restraining the customer's funds and received funds from ServisFirst.

166. Chase's failure to act as a reasonable bank proximately caused harm to ServisFirst by permitting parties conducting check fraud to open and maintain accounts and by permitting fraudulent check funds to be deposited and withdrawn under circumstances that a reasonable bank would have prevented. Those funds should have been available for reimbursement to ServisFirst for the fraudulent checks at issue.

167. Chase knew that ServisFirst was the payor bank for the checks at issue and that such failings would lead to losses for ServisFirst.

168. Chase knew that ServisFirst would have to expend staff and infrastructure resources to combat check fraud and fill the gaps that Chase's procedures left unfilled.

169. Chase's conduct proximately caused ServisFirst to suffer damages in an amount equal to the funds for each check, interest thereon, and the cost of collecting those funds by the efforts of ServisFirst's staff, officers, and counsel, including attorney's fees.

**COUNT V**
**WANTONNESS**

170. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

171. Chase intentionally maintained check fraud policies that are convoluted, contradictory, ambiguous, and vague, such that Chase can purportedly deny liability for check fraud on nearly any grounds.

172. Chase harmed ServisFirst by permitting parties conducting check fraud to open and maintain accounts and by permitting fraudulent check funds to be deposited and withdrawn under circumstances that a reasonable bank would have prevented.

173. Chase either had actual knowledge of the fraud occurring by its customers and within accounts under its control, or its egregious failure to maintain sufficient check fraud policies rendered it willfully ignorant to the fraud occurring.

174. In some cases, Chase investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Thus, Chase knew that the funds at issue resulted from fraud and that neither it nor its customers were entitled to the funds at issue because the funds resulted from fraud.

175. In some cases, Chase placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. In those cases, Chase learned of the fraudulent checks and accounts but nevertheless received double payment as to the funds for fraudulent checks by restraining the customer's funds and received funds from ServisFirst.

176. In some cases, Chase adhered to a procedure of selectively investigating and restricting funds related to purportedly altered transactions, while employing a lower standard of investigation and restriction related to purportedly counterfeit transactions, on the self-serving view that losses related to the latter would fall on payor banks.

177. Chase permitted the fraudulent actors to withdraw funds derived from the fraudulent checks at issue, despite knowing the fraudulent nature of those transactions.

178. This conduct resulted from Chase's reckless or conscious disregard of the industry norms related to check fraud and the accounts at issue, and of the harm

that its conduct would inflict on ServisFirst, other banks, and the American financial system.

179. Chase's conduct proximately harmed ServisFirst by permitting fraudulent actors to withdraw funds that should have been available for reimbursement to ServisFirst for the fraudulent checks at issue.

180. Chase's conduct was reckless and wanton so as to justify the imposition of punitive damages.

**COUNT VI**
**NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION**

181. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

182. The conduct of Chase's employees violated industry standards as to opening customer accounts, reviewing and monitoring the activity of those accounts, failing to observe red flags and indicia of fraud, reviewing red-flagged checks and transactions, and permitting fraudulent actors to withdraw check funds.

183. In some cases, Chase employees investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Those employees then placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. Nevertheless, those employees lifted the restraint on the funds and permitted the withdrawal of the fraudulent funds, in violation of conduct befitting a reasonable bank employee.

184. The conduct of Chase's employees is known by Chase.

185. This conduct by Chase employees constitutes incompetence by industry standards and was known to Chase.

186. Chase failed to act as a reasonable bank and violated industry standards by failing to maintain policies, to supervise, to train, and to review line-level employees' conduct alleged above.

187. Chase intentionally maintained check fraud policies that are so convoluted, contradictory, ambiguous, and vague, that employees and managers could not uniformly apply those policies in compliance with the UCC and reasonable, industry norms as to check fraud matters.

188. Thus, Chase negligently hired, trained, supervised, and retained the employees in the departments responsible for check and account maintenance, review, and fraud, and in all senior positions responsible for supervising those departments.

189. Chase's conduct proximately caused ServisFirst to suffer damages in an amount equal to the funds for each check, interest thereon, and the cost of collecting those funds by the efforts of ServisFirst's staff, officers, and counsel, including attorney's fees.

**COUNT VII**
**CONVERSION**

190. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

191. Chase took possession of funds which are the proceeds of fraud by receiving those funds for deposit and suspending them or transferring them to its own accounts.

192. Those suspended funds are in an earmarked account, capable of identification separate from other funds.

193. Adherence to the UCC and reasonable diligence would have shown Chase that neither it nor the fraudulent account holders were entitled to the funds from the checks at issue because the funds resulted from fraud.

194. In some cases, Chase investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Thus, Chase knew that the funds at issue resulted from fraud and that neither it nor its customers were entitled to the funds at issue because the funds resulted from conversion and/or fraud.

195. ServisFirst paid Chase for the checks at issue, even though Chase was not entitled to those funds. Thus, ServisFirst is entitled to the funds ServisFirst paid to Chase for the fraudulent checks at issue.

196. In some cases, Chase placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. In those cases, Chase gained

possession and control over the funds at issue, with knowledge that the funds resulted from conversion and/or fraud.

197. On information and belief, Chase continues to restrain and refuses to reimburse at least some of the funds that are proceeds of fraud, but which rightfully belong to ServisFirst. In those cases, Chase received double payment as to the funds for fraudulent checks because it restrained the customer's funds and received funds from ServisFirst. Thus, ServisFirst is entitled to the funds ServisFirst paid to Chase for the fraudulent checks at issue.

198. Chase acted with malice, willfulness, and intent by its knowing participation in the check fraud scheme, its possession of funds that it knows belong to ServisFirst, and its ongoing refusal to return funds to ServisFirst.

199. As a direct and proximate result of Chase's possession of and refusal to reimburse the fraudulent check funds, ServisFirst has suffered consequential damages in an amount to be proven at trial, plus interest, costs, and attorneys' fees.

200. In addition, ServisFirst is entitled to punitive damages due to Chase's malice, willfulness, and intent in converting ServisFirst's funds, refusing to return those funds, and refusal to provide information concerning those funds.

## COUNT VIII
## UNJUST ENRICHMENT

201. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

202. Chase took possession of funds which are the proceeds of fraud and/or conversion by receiving those funds for deposit.

203. Those suspended funds are in an earmarked account, capable of identification separate from other funds.

204. Adherence to the UCC and reasonable diligence would have shown Chase that neither it nor the fraudulent account holders were entitled to the funds from the checks at issue because the funds resulted from fraud.

205. In some cases, Chase investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Thus, Chase knew that the funds at issue resulted from fraud and that neither it nor its customers were entitled to the funds at issue.

206. ServisFirst paid Chase for the checks at issue, even though Chase was not entitled to those funds. Thus, ServisFirst is entitled to the funds ServisFirst paid to Chase for the fraudulent checks at issue.

207. In some cases, Chase placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. In those cases, Chase gained possession and control over the funds at issue, with knowledge that the funds resulted from conversion and/or fraud.

208. On information and belief, Chase continues to restrain and refuses to reimburse at least some of the funds that are proceeds of fraud, but which rightfully

belong to ServisFirst. In those cases, Chase received double payment as to the funds for fraudulent checks because it restrained the customer's funds and received funds from ServisFirst. Thus, ServisFirst is entitled to the funds ServisFirst paid to Chase for the fraudulent checks at issue.

209. Chase acted with malice, willfulness, and intent by its knowing participation in the check fraud scheme, its possession of funds that it knows belong to ServisFirst, and its ongoing refusal to return funds to ServisFirst.

210. As a direct and proximate result of Chase's possession of and refusal to reimburse the fraudulent check funds, ServisFirst has suffered consequential damages in an amount to be proven at trial, plus interest, costs, and attorneys' fees.

211. In addition, ServisFirst is entitled to punitive damages due to Chase's malice, willfulness, and intent in obtaining ServisFirst's funds, refusing to return those funds, and refusal to provide information concerning those funds.

## COUNT IX
## CONSPIRACY TO COMMIT CONVERSION AND FRAUD

212. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

213. Chase's account holders engaged in conversion and/or fraud by stealing the checks at issue from the intended payees and making unauthorized changes to those checks. Chase's account holders knew that the changes to the checks rendered them not properly payable.

214. Nevertheless, Chase's account holders deposited the checks into Chase accounts with intent to launder the converted and fraudulently obtained funds. In so doing, the account holders represented that the checks were properly payable and had not been forged or altered. The account holders knew that, ultimately, ServisFirst would rely on this representation that the checks were properly payable.

215. If the account holders knew that the checks were altered, forged, counterfeit, or not properly payable, they bore an obligation to disclose that fact. They knew the checks resulted from fraud and conversion but did not disclose that fact.

216. Chase's account holders then withdrew the funds at issue, with intent to divert funds from the intended payee, the check issuer, and the drawee bank (ServisFirst).

217. This scheme of Chase's account holders occurred at or near the time of deposit of each check, which is identified as the "date" in Exhibit A to this Amended Complaint. The fraudulent scheme concluded when the account holders withdrew the funds at issue in the days or weeks following deposit.

218. Chase joined in this scheme by receiving the fraudulent checks for deposit and knowingly permitting its account holders to withdraw those funds or restraining those funds indefinitely.

219. Adherence to the UCC and reasonable diligence would have shown Chase that neither it nor the account holders were entitled to the funds from the checks at issue because the funds resulted from conversion and/or fraud. In other words, Chase had, at least, constructive knowledge that the funds at issue resulted from conversion and/or fraud and that neither it nor its customers were entitled to the funds at issue.

220. In some cases, however, Chase had actual knowledge of the fraud and conversion scheme. Often, Chase investigated the checks and accounts at issue and concluded that the checks and accounts were fraudulent. Sometimes, Chase employees spoke with the account holder, concluding that the account holder had engaged in suspicious activity, fraud, or conversion. Thus, Chase knew that the funds at issue resulted from conversion and/or fraud and that neither it nor its customers were entitled to the funds at issue.

221. ServisFirst paid Chase for the checks at issue, even though Chase was not entitled to those funds.

222. In some cases, Chase placed holds or restraint on the accounts of fraudulent actors after the deposit of the checks at issue. In those cases, Chase received double payment as to the funds for fraudulent checks because it restrained the customer's funds and received funds from ServisFirst.

223. On information and belief, Chase continues to restrain and refuses to reimburse at least some of the funds that are proceeds of fraud, but which rightfully belong to ServisFirst.

224. In other cases, Chase lifted the account restraints and permitted its customer to withdraw the funds at issue, despite knowing that the funds at issue resulted from conversion and/or fraud and that neither it nor its customers were entitled to the funds at issue.

225. Chase acted with malice, willfulness, and intent by knowingly participating in the check fraud and conversion scheme, retaining possessing funds that resulted from fraud and/or conversion, retaining possession of funds that it knows belong to ServisFirst, permitting its customers to withdraw funds that resulted from conversion and/or fraud, and its ongoing refusal to return funds to ServisFirst.

226. As a direct and proximate result of Chase's possession of and refusal to reimburse the check funds resulting from fraud and/or conversion, ServisFirst has suffered consequential damages in an amount to be proven at trial, plus interest, costs, and attorneys' fees.

227. In addition, ServisFirst is entitled to punitive damages due to Chase's malice, willfulness, and intent in joining in the account holder's fraud and/or conversion scheme to divert ServisFirst's funds, refusing to return those funds, and refusal to provide information concerning those funds.

## COUNT X
## BAD FAITH PRESENTMENT AND REFUSAL TO HONOR WARRANTY

228. ServisFirst adopts and relies on all of the allegations contained in paragraphs 1–135 as if fully set forth here.

229. Chase opened customer accounts, conducted account and check review, and presented the checks at issue under circumstances that were woefully inadequate under prevailing banking norms. Even minimal adherence to those norms would have alerted Chase to the fraudulent conduct of its customers.

230. Even so, and with knowledge that its customers engaged in fraud, it presented checks for payment to ServisFirst.

231. In their communications to Chase, ServisFirst provided the governing UCC provisions and asserted Chase's obvious liability under those provisions.

232. After presentment, Chase conducted additional review of at least some of the checks at issue. That review either failed to comply with prevailing industry norms as to check fraud prevention or ignored obvious signs that the checks resulted from check fraud.

233. In some cases, Chase appears to have restrained the funds at issue, refusing to release the funds to its customer for withdrawal but simultaneously refusing to reimburse ServisFirst for the checks at issue.

234. ServisFirst made repeated attempts to contact Chase and resolve the breach of warranty claims without resorting to litigation.

235. Chase feigned its willingness to reasonably resolve the claims but ultimately ceased all communication with ServisFirst.

236. Chase's refusal to correspond in good faith with ServisFirst continued for months and, in some cases, years after ServisFirst reported many of the fraudulent items at issue.

237. Chase's conduct led ServisFirst to file multiple lawsuits concerning check fraud, as described above. ServisFirst voluntarily dismissed the first of those lawsuits without prejudice on the promise that Chase would negotiate and reimburse the items for which Chase bore liability. Discussions between ServisFirst and Chase then stalled for nearly six months and led to recovery for only one check at issue in the April 2023 case.

238. Chase's handling of the previous lawsuit and discussions afterward did, however, succeed in delaying Chase's obligation to reimburse the checks for which it bears liability. Meanwhile, Chase continued to improperly review new checks that it presented to ServisFirst in breach of the presentment warranty, and which are now at issue in this complaint.

239. ServisFirst was forced to litigate the second lawsuit for nearly three years now, including multiple discovery battles, sanctions imposed on Chase, and over 50 depositions, to vindicate its rights as to straightforward check fraud liability.

240. Chase's refusal to deal in good faith with ServisFirst also flies in the face of widely reported facts establishing the rampant nature of check fraud and the power disparity between larger banks such as Chase and smaller banks such as ServisFirst in handling fraudulent check disputes.

241. Implicit in the presentment warranties is the UCC provision that "every contract or duty within [the UCC] imposes an obligation of good faith in its performance and enforcement." UCC § 1-304.

242. Chase's refusal to honor its presentment warranty and its failure to communicate with ServisFirst about the checks at issue constitutes bad faith, vexatious, and wanton misconduct in mishandling fraudulently presented items.

243. As a direct and proximate result of Chase's bad faith refusal to honor its warranty, ServisFirst have suffered and may recover damages, interest, costs, and attorneys' fees. *See id.*

WHEREFORE, ServisFirst respectfully requests that this Court enter judgment in its favor and against Chase in an amount to be determined by a jury, including interest, costs, attorneys' fees, and other relief as this Court deems just and proper.

## **JURY TRIAL DEMANDED**

ServisFirst hereby demands a trial by jury.

DATED: August 21, 2026.

Respectfully submitted,

*/s/ Michael T. Sansbury*
Michael T. Sansbury (SAN 054)
Tyler N. Smoot (SMO 005)
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, Alabama 35203
TEL: (205) 986-3620
FAX: (205) 986-3659
Email: msansbury@spotswood.com
tsmoot@spotswood.com

*Attorneys for ServisFirst Bank*